AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

SEP 1 3 2019

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Apple iPhone with Model No. A1784, FCC ID BCGE3092A, and IMEI 359216072458515

Case No. '19 MJ 3943

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Controlled Substances |
| 21 U.S.C. § 963 | Conspiracy |

The application is based on these facts:

See attached affidavit, incorporated by reference

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

HSI Special Agent Steven Roman Merklein
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/13/19

*Judge's signature*

City and state: San Diego, California

Hon. Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

# Attachment A

## *Item to be Searched*

The item to be searched is as follows:

> Apple iPhone Cellular Phone
> Model No. A1784
> FCC ID BCGE3092A
> IMEI 359216072458515
> (the "**Target Device**")

The **Target Device** is currently in the possession of the Department of Homeland Security and is presently stored at 2255 Niels Bohr Ct, San Diego, California 92154.

*Affidavit in Support of Search Warrant*                   1

# Attachment B

## *Items to be Seized*

Authorization to search the **Target Device** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, from April 29, 2019 up to and including June 28, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

   g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Steven Roman Merklein, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic device, as further described in Attachment A ("**Target Device**"), and seize evidence of violations of federal law, namely 21 U.S.C. §§ 952, 960, and 963, as further described in Attachment B:

> Apple iPhone Cellular Phone
> Model No. A1784
> FCC ID BCGE3092A
> IMEI 359216072458515
> (the "**Target Device**")

This search warrant supports an investigation and prosecution of Alejandro RAMOS, who is presently charged with committing violations of 21 U.S.C. §§ 952 and 960. A factual explanation supporting probable cause follows.

2. Officers with the Department of Homeland Security, United States Customs and Border Protection ("CBP"), seized the **Target Device** from RAMOS on June 27, 2019, when he was arrested at the Tecate, California, Port of Entry ("POE") for drug smuggling, in violation of 21 U.S.C. §§ 952 and 960. Specifically, RAMOS was found in possession of approximately 13.98 kilograms of methamphetamine hidden in the gas tank of the vehicle that he was driving. The **Target Device** is currently in the possession of the Department of Homeland Security and is presently stored at 2255 Niels Bohr Ct, San Diego, California 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as more particularly described in Attachment B.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the

information known to investigators about this investigation. It contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of drug investigations, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## TRAINING AND EXPERIENCE

5. I am a special agent employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed as a special agent since November of 2018, whereby I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Prior to joining HSI, I was employed as a United States Border Patrol Agent (USBP). While employed as a Border Patrol Agent I served as a Task Force Officer (TFO) on a Drug Enforcement Administration (DEA) Narcotics Task Force and worked on both sector and station level intelligence & abatement teams. I also previously served in the United States Army from 1998 to 2004, serving as an infantry Non-Commissioned Officer. I received an Associates of Science in Criminal Justice degree from Springfield Technical Community College in 2002.

6. During my employment as a border patrol agent and work as a TFO, I've conducted criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling, narcotics smuggling, and organized criminal activity. I have conducted and/or assisted in more than 50 investigations involving controlled substances. I have participated in several controlled purchases of narcotics with the use of confidential informants ("CIs") and I have personally conducted hand-to-hand drug transactions while operating in an undercover capacity. I have authored and/or participated in the execution of narcotic-related arrests and search warrants for violations

involving controlled substances, including heroin, methamphetamine, cocaine, ecstasy, LSD, marijuana, and pharmaceuticals. Through these investigations, I have gained extensive knowledge from users of narcotics, sellers of narcotics, CIs and veteran narcotics detectives regarding the manner in which narcotics are sold, distributed, transported, stored, concealed and ingested.

7. In addition to my experience, I have received multiple formal trainings related to conducting controlled substance investigations. These courses primarily focused on the identification of controlled substances, case management/development, managing CIs, tactical street operations, undercover operations, surveillance operations, highway interdiction, hidden compartments and various methods of drug trafficking and human smuggling. In addition to these courses, I was previously certified by the California Attorney General to conduct wiretaps as authorized in California Penal Code Section 629.50 *et seq*.

8. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and tablets, to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, maps and directions, and phone numbers of co-conspirators.

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics and human trafficking investigations, I am also aware that:

    a. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile, and they have instant access to telephone calls, text, web, email, and voice messages;

b. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c. Drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f. The use of digital devices like cellular telephones, tablets, and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Individuals involved in the illegal possession and acquisition of drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, drugs, criminal proceeds, and assets purchased with criminal proceeds.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text

*Affidavit in Support of Search Warrant*

4

communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

   a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;
   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;
   c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;
   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;
   e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or
   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

11. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a

smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS IN SUPPORT OF PROBABLE CAUSE

13. According to the report of CBP Officer Hernandez, at about 3:43 p.m. on June 27, 2019, Officer Hernandez was conducting inspections in the area of the vehicle primary-inspection lanes at the Tecate POE. At that time, a green 2002 Honda Ridgeline with California license plate 69463C2 (the "Ridgeline") approached the primary inspection booth in lane 1. Officer Hernandez's K-9 Unit alerted to the gas tank located in the undercarriage of the Ridgeline. Officer Hernandez told CBP Officer Eustaquio, who was operating the primary inspection booth, of the K-9 Unit's alert. Officer Hernandez also asked Officer Eustaquio to refer the Ridgeline to the secondary inspection area. Officer Hernandez saw that an adult man was driving the Ridgeline.

14. According to the report of CBP Officer Eustaquio, on June 27, 2019, Office Eustaquio was operating the primary inspection booth in lane 1 at the Tecate POE. At about 3:45 p.m., RAMOS applied to enter the United States by driving the Ridgeline into lane 1. RAMOS presented a California driver's license, said he was going to Balboa Park to visit a friend, and also said that he was driving from Tecate, Mexico, where he lives. RAMOS also provided a negative customs declaration. During the inspection, CBP Officers Grantham

*Affidavit in Support of Search Warrant*   6

and Hernandez reviewed the Ridgeline, and Officer Hernandez's K-9 Unit alerted. Officer Eustaquio referred the Ridgeline to the secondary inspection area.

15. According to the Report of CBP Officer Grantham, at about 3:45 p.m. on June 27, 2019, Officer Grantham was conducting roving inspections in the pre-primary area of the Tecate POE. At about that time, Officer Hernandez informed Officer Grantham that his K-9 Unit had alerted to the undercarriage of the Ridgeline, which was being driven by RAMOS. Officer Grantham conducted a cursory inspection of the Ridgeline in the secondary inspection area and noted a small smell of gasoline and vinegar under the rear passenger seats. At that point, Officer Grantham escorted RAMOS to the security office.

16. Per Officer Grantham's report, Officer Grantham asked RAMOS where he was going, and RAMOS again said he was going to Balboa Park to meet a friend, and then to Coronado for work. In response to Officer Grantham's additional questions, RAMOS said that he had owned the Ridgeline for six months, and that nobody else had driven it.

17. Per Officer Grantham's report, Officer Grantham then returned to the Ridgeline to continue his inspection. Officer Grantham saw tampering with bolts securing the access plate that covers the fuel tank sending unit (*i.e.*, the part of a vehicle that measures the gas level, provides fuel to the engine, returns excess fuel to the tank, and vents excess vapors). Officer Grantham unscrewed the bolts to the access plate and removed the sending unit. Inside the fuel tank, he saw what appeared to be packages floating. Officer Grantham pulled out one of the packages and extracted a sample; testing on the sample indicated the presence of methamphetamine. Ultimately, after a contract mechanic removed the fuel tank and opened it, Officer Grantham seized twenty packages comprising 13.98 kilograms.

18. At about 5:25 p.m., Officer Grantham placed RAMOS under arrest for a violation of 21 U.S.C. §§ 952 and 960. Officer Grantham also seized the packages, the Ridgeline, and the **Target Device**. (Officer Grantham's report does not indicate whether he seized the **Target Device** directly from RAMOS. However, I know from my training and experience that when a person is taken to the security office at the Tecate POE, CBP will gather and hold their personal effects; if that person is placed under arrest, the items are

then seized. In this matter, RAMOS was the driver and sole occupant of the Ridgeline.)

19. I responded to the Tecate POE, and interviewed RAMOS at about 9:02 p.m. I began by providing RAMOS with his *Miranda* rights, which he acknowledged and waived. When I asked RAMOS why he was in his present circumstances, he responded, "I believe it was meth." From there, RAMOS explained that he had previously served as a "lookout" for other cars crossing the border; from my training and experience, I know that drug-trafficking organizations use lookouts to drive through the Ports of Entry, for instance to see which inspection lanes are admitting cars faster than others. RAMOS also told me he was to be paid $400 per package (*i.e.* $8,000). He claimed this was his first time bringing drugs across the border.

20. Given the facts surrounding the arrest of RAMOS, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activity of RAMOS will be found in the **Target Device**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data:

    a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled

   substance from Mexico into the United States;
   e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;
   f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or
   g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

21. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of RAMOS, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. For the reasons set forth above, I request permission to search the **Target Device** for items listed in Attachment B for the time period from April 29, 2019, up to and including June 28, 2019, the day following RAMOS's arrest.

## METHODOLOGY

22. It is not possible to determine, merely by knowing a cellular telephone's or tablet's make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure

environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones and tablets do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models, and some tablets, using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

25. At the time of the events noted in this affidavit, investigators were unable to conduct a forensic download of the **Target Device**, but I reviewed the phone by looking through it manually. I have not relied on any information obtained from a forensic download in this application. Going forward, the Government will rely only on authority to search the **Target Device** provided under warrants.

## CONCLUSION

26. Based on all of the facts and circumstances described above, I believe probable cause exists to conclude that RAMOS used the **Target Device** to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

27. Because the **Target Device** was promptly seized following the arrest of RAMOS at the Tecate POE, there is probable cause to believe that evidence of the smuggling offense committed by him continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from April 29, 2019, up to and including June 28, 2019.

28. WHEREFORE, I request that the court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search the **Target Device**, as described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
STEVEN ROMAN MERKLEIN
Homeland Security Investigations Special Agent
Department of Homeland Security

Subscribed and sworn to before me on this _13th_ day of September, 2019.

_____
THE HON. KAREN S. CRAWFORD
United States Magistrate Judge